IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE YOSAKI TRUST, Russell J. Miller and Mary Miller as co-trustees, and THE MIOKO TRUST, Russell J. Miller and Mary Miller as co-trustees, | §<br>§<br>§<br>§<br>§<br>§ | |
| | § | No. 157, 2025 |
| Plaintiffs Below, Appellants, | §<br>§<br>§ | Court Below: Court of Chancery of the State of Delaware |
| v. | §<br>§ | |
| | § | C.A. No. 2024-0738 |
| TERESA S. WEBER, MARC D. BEER, MARY ELIZABETH CONLON, HAYMAKER SPONSOR III LLC, a Delaware Entity, STEVEN J. HEYER, and COOLEY LLP, a California entity, | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| | § | |
| Defendants Below, Appellees. | §<br>§<br>§ | |

Submitted: October 8, 2025
Decided: December 15, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

## **ORDER**

The Court, having considered the briefs and the record below, and after oral argument, rules as follows:

(1)    This appeal arises out of a dispute involving a de-SPAC transaction ("Transaction").  In a Court of Chancery complaint, the Yosaki Trust and The Mioko Trust (collectively, the "Trusts"), who held equity interests in BioTE Holdings, LLC

("Holdings"), alleged that conflicted fiduciaries at Holdings breached their fiduciary duties by closing a recapitalization transaction that unfairly redistributed equity and conferred control on insiders. The Trusts alleged that they were harmed by diluting their equity interests and diverting Transaction consideration to insiders. The Court of Chancery dismissed their complaint on several grounds, one of which was lack of standing because the Trusts sold their equity interests and therefore no longer had standing to pursue their claims.

(2) On appeal, the Trusts argue that their claims were direct, not derivative, and their direct claims involving their converted stock were not extinguished by selling the converted stock post-Transaction. As explained below, however, even if their claims were direct, once the Trusts sold their equity interests, they lost standing to pursue their claims. We affirm the Court of Chancery's judgment.

(3) Dr. Gary S. Donovitz, M.D., an obstetrician-gynecologist, founded BioTE in 2012 to train medical professionals to administer pellet-based hormone therapy.[1] BioTE Medical, LLC ("Medical") is BioTE's main operating company and is wholly owned by Holdings.[2]

---

[1] App. to Opening Br. at A18–19 [hereinafter A__] (Pls.' Am. Verified Compl. ¶ 9 [hereinafter Compl.]).

[2] A20 (Compl. ¶¶ 14–15).

(4)     Defendant Teresa Weber ("Weber") was the Chief Executive Officer of Medical during the relevant times, and Marc Beer ("Beer") was Medical's Executive Chairman of the Board of Managers.[3]  Defendant Mary Conlon ("Conlon," and together with Weber and Beer, the "Insider Defendants") was the Vice President of Business Development and General Counsel of Medical and Holdings.[4]

(5)     Beginning in June, 2021, the Trusts alleged that the Insider Defendants and BioTE's outside counsel, Cooley LLP ("Cooley"), negotiated a Business Combination Agreement ("BCA") with defendant Haymaker Sponsor III LLC ("Haymaker Sponsor") and its CEO, Defendant Steven J. Heyer ("Heyer," and together with Haymaker Sponsor, "Haymaker Defendants").  As the Court of Chancery correctly observed, despite the complaint characterizing the Transaction as a "[m]erger,"[5] it did not involve an exchange of consideration to qualify as a merger.[6]  Instead, prior to closing, Holdings redomiciled from Nevada to Delaware[7] and recapitalized its existing equity classes (Class A Units, Class AA Units, Class AAA Units, and Class AAAA Units) into a single class of equity designated as Class

---

[3] A20–21 (Compl. ¶¶ 16–17).

[4] A22 (Compl. ¶ 18).

[5] *See, e.g.*, A16 (Compl. ¶ 2).

[6] *See* A252–57 (Oral Args. and Rulings of the Ct. on Defs.' Mots. to Dismiss at 38:12–43:20).

[7] A20 (Compl. ¶ 14).

A Common Units.[8]   Thereafter, Haymaker Acquisition Corp. III ("Haymaker SPAC") and Holdings cross-issued equity resulting in "an umbrella partnership C-corporation, or 'Up-C' structure," with the Haymaker SPAC serving as the publicly traded entity and Holdings as the flow-through entity indirectly holding substantially all of the assets.[9]

(6)    Specifically, Holdings issued some of its new Class A Common Units to the Haymaker SPAC, and in turn, the Haymaker SPAC issued to Holdings the cash remaining at closing as well as newly created Class V stock.[10]  The Class V stock held voting rights but no equity interest.[11]  Holdings thereafter distributed the Class V stock to holders of the pre-transaction Class A Common Units, which included the Trusts.[12]  The holders of the pre-transaction Class A Common Units had the right to convert one Class A Common Unit and one Class V share into a single publicly traded share of the Haymaker SPAC.[13]  Haymaker SPAC became the sole

[8] App. to Answering Br. at B414 [hereinafter B__] (Business Combination Agreement, Annex A to Schedule 14A, Definitive Proxy Statement, Haymaker Acquisition Corp. III (May 5, 2022) [hereinafter BCA]).

[9] B45 (Schedule 14A, Definitive Proxy Statement, Haymaker Acquisition Corp. III (May 5, 2022)).

[10] *See* B434–35 (BCA §§ 2.1, 2.2).

[11] *See* B45 (Schedule 14A, Definitive Proxy Statement, Haymaker Acquisition Corp. III (May 5, 2022)).

[12] B434 (BCA § 2.1(d)).

[13] B549–50 (Second Am. & Restated Operating Agreement of BioTE Holdings, LLC, Annex I to Schedule 14A, Definitive Proxy Statement, Haymaker Acquisition Corp. III (May 5, 2022)).

managing member of Holdings and renamed itself biote Corp ("PubCo").[14]

(7)     Before the Transaction, the Trusts each owned 2.8% of Holdings.[15] Immediately following closing, through their ownership of Holdings' Class A Common Units and the new Class V shares, the Trusts each owned about 2% of the resulting public company's equity and voting rights.[16]   The Trusts voluntarily converted their Holdings' Class A Common Units and Class V Haymaker SPAC shares into biote Corp. Class A common stock ("PubCo stock").  The Trusts then voluntarily sold their PubCo stock.[17]

(8)     In their complaint, the Trusts alleged that, although Holdings expected to receive over $317.5 million in SPAC funding, primarily because 98% of the Haymaker SPAC investors redeemed their shares, Holdings received only about $12 million.[18]   The Court of Chancery summarized the "principal effect" of the Transaction as "dilut[ing] the ownership interest . . . [of the] pre-transaction members of Holdings . . . in return for whatever minimal cash the [Haymaker] SPAC

---

[14] A23–24 (Compl. ¶ 21).

[15] A19 (Compl. ¶ 11).

[16] *See id.*

[17] A153 (Pls.' Consol. Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 42).

[18] A16–17 (Compl. ¶ 4).

brought to the table."[19]

(9) In July 2024, the Trusts filed a complaint in the Court of Chancery asserting breach of fiduciary duty claims against the Insider Defendants, aiding and abetting breaches of fiduciary duty against the Haymaker Defendants and Cooley, and unjust enrichment against all defendants. In response, the defendants filed motions to dismiss under Ch. Ct. R. 23.1 and Ch. Ct. R. 12(b)(6).

(10) The Court of Chancery granted the motions. First, the court held that, because the Trusts' claims arose out of a cash and equity transaction that diluted their interests, their claims were derivative under *Brookfield Asset Mgmt., Inc. v. Rosson.*[20] Thus, the Trusts failed to "allege facts supporting a reasonable inference that the plaintiff has standing to sue derivatively[,]" as required by Ch. Ct. R. 23.1(a)(2).[21]

(11) Second, the court dismissed the amended complaint under the "continuous ownership rule" in *Lewis v. Anderson.*[22] The rule requires "that a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at time of commencement of suit but that he must also maintain

---

[19] A266–67 (Oral Args. and Rulings of the Ct. on Defs.' Mots. to Dismiss at 52:14–53:8).

[20] 261 A.3d 1251, 1260 (Del. 2021) ("[D]ilution claims are classically derivative[.]").

[21] A269–70 (Oral Args. and Rulings of the Ct. on Defs.' Mots. to Dismiss at 55:21–56:6).

[22] 477 A.2d 1040 (Del. 1984); A273–74 (Oral Args. and Rulings of the Ct. on Defs.' Mots. to Dismiss at 59:23–60:8).

6

shareholder status throughout the litigation."[23]  As noted above, it is undisputed that the Trusts no longer owned an equity interest in any of the involved entities.[24]

(12)    Finally, even if the Trust's claims were direct, as opposed to derivative, the court held that, under *Urdan v. WR Capital Partners, LLC*,[25] dilution claims were not personal to the holder of the stock and therefore "travel" with the sale of the stock.[26]  Thus, the Trusts lost standing to pursue their claims when they converted their Holdings' Class A Common Units and Class V Haymaker SPAC shares into PubCo stock and sold that stock.

(13)    The Trusts raise two main arguments on appeal.  First, they contend that the Court of Chancery erred in finding that the Trusts' claims were derivative.[27]  According to the Trusts, *Brookfield* did not overrule this Court's decision in *Parnes v. Bally Ent. Corp.*[28]  which, according to them, stands for the "settled principle that when fiduciaries extract side payments or self-dealing benefits from a transaction at

---

[23] 477 A.2d at 1046.

[24] A153 (Pls.' Consol. Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 42).

[25] 244 A.3d 668 (Del. 2020); A274–75 (Oral Args. and Rulings of the Ct. on Defs.' Mots. to Dismiss at 60:21–61:4).

[26] 244 A.3d at 678.

[27] Opening Br. at 5.

[28] 722 A.2d 1243 (Del. 1999).

the expense of legacy owners, the resulting harm is personal and redressable by direct claims."[29]

(14)  Second, the Trusts contend that *Urdan* is inapposite because their claims "arose well before the closing of the [T]ransaction, when they held entirely different securities: Class AAA Units in Holdings—a Nevada LLC[.]"[30]  Thus, they say, because *Urdan* "presumes voluntary sales *of the same securities*[,]" the Trusts still have standing to pursue their claims.[31]  The standing issue raises questions of law which we review *de novo*.[32]

(15)  As we see it, the appeal can be decided based on our *Urdan* decision. In *Urdan*, we observed that "a purchaser of a . . . security acquires all rights in the security that the transferor had or had power to transfer."[33]  We noted that the words "all rights in the security" distinguishes between rights that "inhere in the security itself" and personal rights which do not travel with the sale of a security.[34]  Claims

---

[29] Opening Br. at 6.

[30] *Id*.

[31] *Id*. at 7 (emphasis added).

[32] *Empls. Ins. Co. of Wausau v. First State Orthopaedics, P.A.*, 312 A.3d 597, 606 (Del. 2024) ("We also review questions of justiciability, including standing, *de novo*.").

[33] 244 A.3d at 677 (citing 6 *Del. C.* § 8-302(a)).

[34] 244 A.3d at 677 (citing *In re Sunstates Corp. S'holder Litig.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001)).

that arise from "the relationship among stockholder, stock and the company" inhere in the security itself.[35] Personal claims arise when the underlying "property happens to be shares, but the cause of action is not a property right carried by the shares."[36] Examples of the former category include a claim alleging a corporate charter violation, the fairness of a proposed transaction, or a challenge to executive compensation.[37] "[E]xamples of personal claims would include a contract claim for breach of an agreement to purchase or sell shares or a tort claim for fraud in connection with the purchase or sale of shares."[38]

(16) After *Urdan*, dilution claims, "*[w]hether* described as direct, derivative, or both," are "not personal to the plaintiffs and travel[ ] with the sale of their [ ] stock."[39] The same is true of diversion claims – they involve the relationship between the stockholder and the company, not a claim arising out of a share sale. It is undisputed that, following closing, the Trusts converted their Holdings' Class A

---

[35] 244 A.3d at 677 (citing *I.A.T.S.E. Local No. One Pension Fund v. Gen. Elec. Co.*, 2016 WL 7100493, at *5 (Del. Ch. Dec. 6, 2016)).

[36] 244 A.3d at 677 (citing *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2016)).

[37] *See* 244 A.3d at 677.

[38] *Id*. (citing 124 A.3d at 1056).

[39] 244 A.3d at 678 (emphasis added).

Common Units and Class V shares into PubCo stock and then sold that stock.[40] Under *Urdan*, the Trusts' dilution and diversion claims traveled with the Class A Common Units and Class V shares. The Trusts lost standing after exchanging the equity and selling the PubCo shares.

(17) The Trusts try to distinguish *Urdan* by arguing that "[t]he logic undergirding *Urdan* (which did not involve a merger) breaks down when, as here, the securities to which any claims attached were forcibly converted or exchanged as a precondition to the transaction a plaintiff challenges."[41] In other words, (a) their claims arose at the time the Trusts held Class AAA Units in Holdings as a Nevada LLC; (b) their Class AAA units were *involuntarily* exchanged or converted into Class A Common Units; and therefore (c) an *involuntary* conversion occurred which allows them to pursue their claims post-Transaction.

(18) As an initial matter, the Trusts did not raise this argument below. Instead, in the Court of Chancery, the Trusts attempted to distinguish *Urdan* because the transaction in *Urdan* did not involve the involuntary surrender of equity through a merger transaction.[42] But as the Trusts eventually agreed, the transaction here did

---

[40] A153 (Pls.' Consol. Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 42).

[41] Opening Br. at 31.

[42] *See* A154–55 (Pls.' Consol. Answering Br. in Opp'n to Defs.' Mots. to Dismiss at 43–44).

not involve a merger.[43] Thus, the Trusts cannot present a new argument for the first time on appeal.[44]

(19) Even if the Trusts did not waive their new argument, we find it unpersuasive. The Holdings' conversion from Nevada to Delaware, and recapitalization of the existing equity classes (Class A Units, Class AA Units, Class AAA Units, and Class AAAA Units) into a single class of equity designated as Class A Common Units, was only preparatory to the Transaction. It was the exchange of Class A Holdings Units and Class V shares where the dilution and diversion is alleged to have occurred. The Trusts retained their equity interest in Holdings after the recapitalization. They could have held those units and preserved standing. Instead, they voluntarily exchanged their Holdings' equity for PubCo shares. With the exchange and sale of the PubCo shares went the standing to pursue dilution and conversion claims.

NOW, THEREFORE, IT IS HEREBY ORDERED that the judgment of the Court of Chancery is AFFIRMED.

BY THE COURT:

*/s/ Collins J. Seitz, Jr.*
Chief Justice

---

[43] Opening Br. at 21 ("*Although the transaction was not technically a merger*, it functionally operated as one.") (emphasis added).

[44] Supr. Ct. R. 8.

11